

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**MEMORANDUM, ORDER,
AND JUDGMENT**

04-MD-1596

| In re: ZYPREXA PRODUCTS LIABILITY LITIGATION |
| --- |

DYAN R. MOORE, LARRY B. MOORE,
LASHAUNTA B. MOORE, MALIKA M.
MOORE, individually and as successors in
interest to ZETTIE MARSHALL,

Plaintiffs,

– against –

ELI LILLY & COMPANY, JOHN DOES 1-
10,

Defendants.

11-CV-5552




FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ APR 2 3 2012 ★

BROOKLYN OFFICE

**Appearances:**

For the Plaintiffs:

    Dyan R. Moore, *pro se*

    Los Angeles, CA

    Larry B. Moore, *pro se*

    Coalinga, CA

For the Defendants:

    Adam B. Michaels

    Pepper Hamilton LLP

    New York, NY

    David L. Foberg

    Pepper Hamilton LLP

    Philadelphia, PA

1





**JACK B.WEINSTEIN, Senior United States District Judge:**

## Table of Contents

I.      Introduction ........................................................................................................................... 2

II.     Facts ....................................................................................................................................... 3

   A.   Contents and Use of Zyprexa ............................................................................................. 4

   B.   Labeling and Warnings to Patients and Medical Professionals ......................................... 4

      1.   FDA Labeling and the "Dear Doctor Letter" .............................................................. 4

      2.   Consensus Statement of American Diabetes Association and Other Learned Groups ................ 7

      3.   FDA March 2007 Letter ................................................................................................ 9

      4.   Findings on Medical Community's Knowledge of Zyprexa's Risks ............................ 9

   C.   Zettie Marshall's Zyprexa Use and Procedural History .................................................. 11

III.    Law ....................................................................................................................................... 13

   A.   Summary Judgment Standard ............................................................................................ 13

   B.   Choice of Law ................................................................................................................... 14

   C.   California Law—Res Judicata ........................................................................................... 14

   D.   California Law—Statute of Limitations ............................................................................ 15

IV.    Application of Law to Facts ................................................................................................. 16

V.     Conclusion ........................................................................................................................... 16

## I.      Introduction

Defendant Eli Lilly & Company ("Lilly") moves to dismiss the complaint of plaintiffs

Dyan Moore and Larry Moore (collectively, "Plaintiffs"). Plaintiffs commenced this action

against Lilly in a California state court in November 2010. Since the parties' moving papers rely

on and make reference to matters outside of the pleadings, the court treated Lilly's motion as one

for summary judgment, with the parties' consent. *See* Fed. R. Civ. P. 12(d); *Roth v. Jennings*,

489 F.3d 499, 509 (2d Cir. 2007); *Global Network Comms. v. City of New York*, 458 F.3d 150,

154-55 (2d Cir. 2006); *see also* March 20, 2012 Hearing Transcript.

The present action is essentially a wrongful death claim.  Plaintiff Dyan Moore is the daughter of Zettie Marshall.  Plaintiff Larry B. Moore is the former brother-in-law of Dyan Moore.  Plaintiffs contend that Zyprexa, a drug manufactured by Lilly, caused Ms. Marshall's death in December 2005.

For the reasons indicated below, summary judgment against Plaintiffs is granted.

## II.     Facts

The present case is part of a massive and highly complex multidistrict litigation that has included claims by individual Zyprexa users, state attorneys general, third-party payors, and other entities alleging physical or financial injury.  Some 30,000 cases have been brought against Lilly by individual plaintiffs suffering from serious psychiatric problems who were treated with Zyprexa.  These individuals plaintiffs principally allege that Zyprexa caused deleterious side effects, including excessive weight gain, hyperglycemia, and diabetes; that Lilly misled them and their physicians about the likelihood of these side effects; and that, had they or their attending physicians been aware of the risks, they would not have taken Zyprexa.  The court has previously detailed the procedural history and factual background of this multidistrict litigation.  *See, e.g., Mississippi v. Eli Lilly & Co. (In re Zyprexa Prods. Liab. Litig.)*, 671 F. Supp. 2d 397 (E.D.N.Y. 2009); *Blume v. Eli Lilly & Co. (In re Zyprexa Prods. Liab. Litig.)*, Nos. 04-MD-1596, 06-CV-2782, 2009 WL 3596982 (E.D.N.Y. Oct. 20, 2009).  *See generally* Amalea Smirniotopoulos, Note, *Bad Medicine: Prescription Drugs, Preemption, and the Potential for a No-Fault Fix*, 35 N.Y.U. Rev. L. & Soc. Change 793, 813-19 (2011) (describing similar mass drug litigation).

3

A.    Contents and Use of Zyprexa

Zyprexa's active ingredient is olanzapine, one of a class of medications known as "atypical" or "second generation" antipsychotics.  It was approved for use in treating schizophrenia and acute manic episodes associated with bipolar disorder by the United States Food and Drug Administration ("FDA") in 1996.  In 2004, the FDA also approved Zyprexa for the treatment of bipolar disorder generally.

B.    Labeling and Warnings to Patients and Medical Professionals

1.    FDA Labeling and the "Dear Doctor Letter"

The original 1996 Zyprexa package insert accompanying the drug disclosed information about possible side effects of administration of olanzapine based on clinical trials.  The insert provided, in part, the following information:

> Adverse Events Occurring at an Incidence of 1% or More Among Olanzapine-Treated Patients in Short-Term, Placebo-Controlled Trials - - Table 1 enumerates the incidence, rounded to the nearest percent, of treatment-emergent adverse events that occurred during acute therapy (up to 6 weeks) of schizophrenia in 1% or more of patients treated with olanzapine (doses ≥ 2.5 mg/day) where the incidence in patients treated with olanzapine was greater than the incidence in placebo-treated patients.
>       The prescriber should be aware that the figures in the tables and tabulations cannot be used to predict the incidence of side effects in the course of usual medical practice where patient characteristics and other factors differ from those that prevailed in the clinical trials.   Similarly, the cited frequencies cannot be compared with figures obtained from other clinical investigations involving different treatments, uses, and investigators.  The cited figures, however, do provide the prescribing physician with some basis for estimating the relative contribution of drug and nondrug factors to the side effect incidence in the population studies.

Zyprexa Package Insert 11 (Oct. 1, 1996) (original emphasis).

4

Two tables in the insert provided the results of placebo-controlled clinical studies of olanzapine-treated patients. The data indicates that, over a six-week administration of Zyprexa, six percent of olanzapine-treated patients reported weight gain, while only one percent of the placebo-treated patients reported weight gain. *Id.* at 12-16.

For several years, this information on the insert remained substantially the same insofar as it provided physicians information on reported weight-gain-related adverse events. During this period, the results of longer-term studies and clinical experience with Zyprexa and competing drugs supporting weight gain, hyperglycemia, and diabetes became widely known. *See* Part II.B.4, *infra.*

In May 2000, the FDA undertook an analysis of the incidence of diabetes and hyperglycemia in patients using atypical antipsychotics. The director of the FDA's Division of Neuropharmacological Drug Products requested additional safety information about Zyprexa from Lilly. In its letter, the FDA cited post-marketing reports of diabetes-related adverse events associated with Zyprexa use. In response, Lilly provided the FDA with clinical studies, data analysis, and case report reviews. *See In re Zyprexa Prods. Liab. Litig.*, 253 F.R.D. 69, 119 (E.D.N.Y. 2008). There is disagreement about whether the information given by Lilly to the FDA was complete and accurate.

On September 11, 2003, the FDA announced it would require a warning about risks of hyperglycemia and diabetes mellitus and treating precautions to appear in the package insert of all atypical antipsychotics, including Zyprexa. Designed for prescribing doctors, the label noted that epidemiological studies and other information indicated that the relationship between the drug and hyperglycemia and diabetes was not yet fully understood. It reads as follows:

**WARNINGS**
**Hyperglycemia and Diabetes Mellitus**
Hyperglycemia, in some cases extreme and associated with ketoacidosis or hypersomolar coma or death has been reported in patients treated with atypical antipsychotics including Zyprexa. Assessment of the relationship between atypical antipsychotic use and glucose abnormalities is complicated by the possibility of an increased background risk of diabetes mellitus in patients with schizophrenia and the increasing incidence of diabetes mellitus in the general population. Given these confounders, the relationship between atypical antipsychotic use and hyperglycemia-related adverse events is not completely understood. However, epidemiological studies suggest an increased risk of treatment-emergent hyperglycemia-related adverse events in patients treated with the atypical antipsychotics studied. Precise risk estimates for hyperglycemia-related adverse events in patients treated with atypical antipsychotics are not available. . . .

Patients with an established diagnosis of diabetes mellitus who are started on atypical antipsychotics should be monitored regularly for worsening of glucose control. Patients with risk factors for diabetes mellitus (e.g., obesity, family history of diabetes) who are starting treatment with atypical antipsychotics should undergo fasting blood glucose testing at the beginning of treatment and periodically during treatment. Any patient treated with atypical antipsychotics should be monitored for symptoms of hyperglycemia including polydipsia, polyuria, polyphagia, and weakness. Patients who develop symptoms of hyperglycemia during treatment with atypical antipsychotics should undergo fasting blood glucose testing. . . .

Letter from Russell Katz, M.D., Dep't of Health & Human Servs., to Gregory T. Brophy, Ph.D.,

Eli Lilly & Co., Sept. 11, 2003, at 1-2. The label did not mention weight gain or diabetes in the

"warning to patients" section.

Lilly added the FDA-required language to the Zyprexa label on September 16,

2003. *See* Zyprexa Package Insert (Sept. 16, 2003). At the FDA's request, on March 1, 2004, it

6

sent a "Dear Doctor" letter to physicians in the United States informing them of the 2003 label change. *See In re Zyprexa Prods. Liab. Litig.*, 253 F.R.D. at 134-36.

> 2. Consensus Statement of American Diabetes Association and Other Learned Groups

In November 2003, the American Diabetes Association, American Psychiatric Association, American College of Clinical Endocrinologists, and the North American Association for the Study of Obesity convened a consensus development conference (the "ADA consensus conference") on the subject of the association between antipsychotic drugs and diabetes. An eight-member panel heard presentations from fourteen experts drawn from the fields of psychiatry, obesity, and diabetes, FDA representatives, and atypical antipsychotic drug manufacturers. The panel reviewed the relevant peer-reviewed English language scientific articles.

The ADA consensus conference concluded that Zyprexa and Clozaril posed an increased risk of diabetes as compared to other atypical antipsychotic drugs. The consensus statement produced by the conference declared that these relative risks as well as advantages of the drugs for individual patients in a heterogeneous population "should . . . influence drug choice." In part, its report concluded:

> There is considerable evidence, particularly in patients with schizophrenia, that treatment with [atypical antipsychotics] can cause a rapid increase in body weight in the first few months of therapy that may not reach a plateau even after 1 year of treatment. There is, however, considerable variability in weight gain among the various [atypical antipsychotics] . . . .

\*\*\*

7

Clozapine [Clozaril] and olanzapine [Zyprexa] . . . produce the greatest weight gain.

\*\*\*

Despite limitations in study design, the data consistently show an increased risk for diabetes in patients treated with clozapine [Clozaril] or olanzapine [Zyprexa] compared with patients not receiving treatment with [first generation antipsychotics] or with other [atypical antipsychotics]. The risk in patients taking risperidone and quetiapine is less clear; some studies show an increased risk for diabetes, while others do not. The two most recently approved [atypical antipsychotics], aripiprazole and ziprasidone, have relatively limited epidemiological data, but available clinical trial experience with these drugs has not shown an increased risk for diabetes.

\*\*\*

[T]he risks of obesity, diabetes, and dyslipidemia have considerable clinical implications in this patient population and should . . . influence drug choice.

Even for those medications associated with an increased risk of metabolic side effects, the benefit to specific patients could outweigh the potential risks. For example, clozapine [Clozaril] has unique benefits for treatment-refractory patients and those at significant risk for suicidal behavior. Since treatment response in many psychiatric conditions is heterogeneous and unpredictable, physicians and patients can benefit from the availability of a broad array of different therapeutic agents.

\*\*\*

These three adverse conditions [obesity, diabetes, and dyslipidemia] are closely linked, and their prevalence appears to differ depending on the [atypical antipsychotic] used. Clozapine [Clozaril] and olanzapine [Zyprexa] are associated with the greatest weight gain and highest occurrence of diabetes and dyslipidemia. Risperidone and quetiapine appear to have intermediate effects. Aripiprazole and ziprasidone are associated with little or no significant weight gain, diabetes, or dyslipidemia, although they have not been used as extensively as other agents.

> The choice of [atypical antipsychotic] for a specific patient depends on many factors. The likelihood of developing severe metabolic disease should also be an important consideration.

American Diabetes Association, et al., *Consensus* Development Conference on Antipsychotic

Drugs and Obesity and Diabetes, 27 Diabetes Care 596, 596-97 (Feb. 2004)

### 3. FDA March 2007 Letter

On March 27, 2007, the FDA raised new concerns about the adequacy of Zyprexa's

warning label in a letter to Lilly:

> [W]e are concerned that the labeling is deficient with regard to information about weight gain, hyperglycemia, and hyperlipidemia that is associated with olanzapine [Zyprexa] use . . . .
>
> Our overall goal is to improve labeling with regard to these findings so that clinicians will be better informed on what the risks are for their patients. They cannot make reasonable treatment decisions until they have such information. We do not feel that current labeling for . . . Zyprexa provides sufficient information on these risks, and we fully intend to insure that . . . labels are enhanced with the best available information to characterize these risks.

*In re Zyprexa Prods. Liab. Litig.*, 253 F.R.D. at 141 (quoting Letter from Thomas Laughren,

FDA, to Robin Pitts Wojcieszek, Eli Lilly & Co., Mar. 27, 2007).

### 4. Findings on Medical Community's Knowledge of Zyprexa's Risks

A universally applicable date from which the statute of limitations is to be considered to

run on an individual Zyprexa user's claim has not been determined. Numerous events represent

moments at which a patient, health care provider, institution, or the medical community at large

arguably discovered that the cause of an alleged injury may have been the administration of

Zyprexa. The evidence in this mass litigation, including medical records and the depositions of

numerous doctors, suggests that it was widely known and understood in the late 1990s among

9

treating and prescribing physicians that weight gain might follow the administration of Zyprexa. The association between weight gain and heightened risk of diabetes was also broadly recognized by that time.

Formal events bringing this information to the medical profession include the September 2003 Zyprexa label change and contemporaneous press release, the 2003 consensus statement of the American Diabetes Association, and the March 2004 "Dear Doctor" letter distributed nationwide to physicians by Lilly.

In its June 2007 memorandum, order, and judgment on four motions for summary judgment in individual Zyprexa injury cases, this court found that, for purposes of these motions, the March 1, 2004 "Dear Doctor" letter would be considered the latest possible date on which members of the medical community knew or should have known about Zyprexa's obesity- and diabetes-related risks to patient health. *See Souther v. Eli Lilly & Co. (In re Zyprexa Prods. Liab. Litig.)*, 489 F. Supp. 2d 230, 278 (E.D.N.Y. 2007). In *Souther*, applying the relevant "learned intermediary" doctrine, it was determined that the claim of one of the plaintiffs was barred by the statute of limitations:

> Diabetes developed and Zyprexa was prescribed [to plaintiff Cusella] years before the September 2003 label change. *At least from the date of [the] March 2004 Dear Doctor letter, the causal connection between Zyprexa and diabetes was known to Dr. Ganime, Cusella's treating physician.* Since Lilly's duty to warn ran to Dr. [Ganime] rather than Cusella, it became Dr. Ganime's duty from that point onwards to disclose to Cusella that Zyprexa might exacerbate his diabetes, and that it may have been the impetus behind Cusella's insulin-dependancy in the first place.
> Dr. Ganime's medical records and deposition testimony . . . show that Cusella was warned numerous times about the link between Zyprexa and diabetes. While the pre-label change warnings Dr. Ganime received from Lilly *may* not have been adequate to absolve Lilly of liability to Cusella, those warnings

10

> Cusella received from Dr. Ganime following the label change placed him on notice that use of Zyprexa might have worsened his diabetes and caused him to become insulin-dependent.
>
> *Measured either against the date Cusella developed diabetes—August 1999—or the latest possible date Dr. [Ganime] was aware of the potential causal connection between Zyprexa and diabetes—March 2004—*Pennsylvania's two year statute of limitations had run on Cusella's claim before he filed this suit in April of 2006.

*Id.* (emphases added; citations to record omitted).

The March 1, 2004 date represents the "latest possible date" prescribing physicians and, in effect, their patients are deemed aware of the potential causal connection between Zyprexa and diabetes and from which the statute of limitations may run as to any individual plaintiff. Nevertheless, a fact-specific analysis is necessary for each case to determine when the plaintiff— whether independently or by operation of the learned intermediary doctrine—knew of the potential causal connection between Zyprexa and adverse health effects. The facts in many individual cases indicate a much earlier date of discovery for purposes of the statute of limitations. *See, e.g.,* Appendices A-D of *Souther v. Eli Lilly & Co. (In re Zyprexa Prods. Liab. Litig.),* Nos. 04-MD-1596, 06-CV-1729, Docket Entries Nos. 88-1 to 88-4 (E.D.N.Y. June 11, 2007) (including relevant depositions demonstrating doctors' awareness of Zyprexa's association with patient weight gain).

C.  Zettie Marshall's Zyprexa Use and Procedural History

Zettie Marshall, the mother of plaintiff Dyan Moore, was born in Florida. She moved to California as a young woman, and had three children. *See* Pl.'s Fact Sheet 2-3. Ms. Marshall was prescribed Zyprexa in 2001 by her California physician. She died of a heart attack in December 2005. She was seventy-two years old.

11

Plaintiffs in the instant case are California residents. They submitted a claim to Lilly for damages in January 2006, contending that Zyprexa had caused Ms. Marshall's death. *See* Request for Judicial Notice 38-40, Moore v. Eli Lilly & Co., No. 11-CV-5552 (E.D.N.Y. Nov. 8, 2011), CM/ECF No. 12. Several years later, plaintiff Dyan Moore filed a wrongful death action in a California state court in Los Angeles County, California, on November 8, 2010. *See id.* at 6. That case—in which Dyan Moore was the sole plaintiff— was voluntarily dismissed with prejudice in February 2011. *See id.* at 6-7, 29.

Plaintiffs brought the present wrongful death action in a California state court in Orange County, California, on November 22, 2010, contending that Zyprexa caused Ms. Marshall's death. *See* Notice of Removal with Attachments 12, Moore v. Eli Lilly & Co., No. 11-CV-5552 (E.D.N.Y. Nov. 1, 2011), CM/ECF No. 1. Lilly attempted to remove the case to federal court, *see* 28 U.S.C. § 1441(a), but Judge Percy Anderson of the United States District Court for the Central District of California remanded the case to state court, concluding that defendants had not adequately demonstrated complete diversity of citizenship between the parties. *See* Notice of Removal with Attachments 5-6, Moore v. Eli Lilly & Co., No. 11-CV-5552 (E.D.N.Y. Nov. 1, 2011), CM/ECF No. 1-1. The claims of two plaintiffs originally named in this action, Malika Moore and LaShaunta Moore, were dismissed without prejudice by a state-court judge in October 2011. *See id.* at 50.

After ascertaining from discovery that there was complete diversity as between Lilly and the Plaintiffs, *see* 28 U.S.C. § 1446(b), Lilly removed the case in late 2011 to the United States District Court for the Central District of California. *See* Notice of Removal 1-8, Moore v. Eli

12

Lilly & Co., No. 11-CV-5552 (E.D.N.Y. Nov. 1, 2011), CM/ECF No. 1. The case was transferred to this court pursuant to an order of the Judicial Panel on Multidistrict Litigation.

In the instant motion, Lilly moves to dismiss the complaint, contending that Plaintiffs' claims are barred by the doctrine of res judicata and by the statute of limitations. As noted above in Part I, *supra*, Lilly's motion is deemed one for summary judgment.

**III. Law**

A. Summary Judgment Standard

Summary judgment is appropriate only if "there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see, e.g.*, *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 5 (2d Cir. 1999). Summary judgment is warranted when after construing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor, there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Anderson*, 477 U.S. at 247-50, 255.

The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995); *see, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If the moving party appears to meet this burden, the opposing party must produce evidence that raises a question of material fact to defeat the motion. *See* Fed. R. Civ. P. 56(c). This evidence may not consist of "mere conclusory allegations, speculation or conjecture." *Cifarelli v. Vill. of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996); *see Del. & Hudson Ry. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) ("Conclusory allegations will not suffice to create a genuine issue").

13

B.    Choice of Law

A multidistrict litigation transferee court applies the choice of law and statute of limitations rules of the state in which the action was filed. *Menowitz v. Brown*, 991 F.2d 36, 40 (2d Cir. 1993) (citing *Van Dusen v. Barrack*, 376 U.S. 612 (1964)). Because the instant action was originally commenced in California, that state's choice of law principles apply.

"California applies the 'governmental interest' approach to conflicts issues." *Love v. Associated Newspapers, Ltd.*, 611 F.3d 601, 610 (9th Cir. 2010) (applying California law). Under California law, "[w]here . . . parties do not address choice-of-law issues, California courts presumptively apply California law." *Johnson v. Lucent Techs. Inc.*, 653 F.3d 1000, 1008 (9th Cir. 2011) (applying California law) (citing *Washington Mut. Bank, FA v. Superior Court*, 15 P.3d 1071, 1080 (Cal. 2001)).

In this case, the decedent was a resident of California, and critical relevant conduct took place in that state. Ms. Marshall was prescribed Zyprexa in California, all of her known physicians practice in that state, and she was hospitalized there; Lilly's alleged national failure to warn had an impact there, as well. Because California has the largest interest in the resolution of this litigation, the court will apply that state's law to adjudicate the Plaintiffs' claims.

C.    California Law—Res Judicata

Plaintiffs' complaint rests on the basic allegation that Zyprexa wrongfully caused Ms. Marshall's death.

A federal court must give to a prior state-court judgment "the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984); *see* 28 U.S.C. § 1738.

14

California law provides that a "dismissal with prejudice by plaintiff of its action is a bar to a subsequent action on the same cause; otherwise there would be no meaning to the 'with prejudice' feature. A dismissal with prejudice terminates the action and the rights of the parties are affected by it. It is a final judgment in favor of defendants." *Roybal v. Univ. Ford*, 207 Cal. App. 3d 1080, 1085-86 (Cal. Ct. App. 1989) (internal quotation marks omitted). A "request for dismissal with prejudice . . . bars a new action." *Id.* (emphasis omitted).

"California law defines a 'cause of action' for purposes of the res judicata doctrine by analyzing the primary right at stake: A 'cause of action is comprised of a primary right of the plaintiff, a corresponding primary duty of the defendant, and a wrongful act by the defendant constituting the breach of that duty. The most salient characteristic of a primary right is that it is indivisible: the violation of a single primary right gives rise to but a single cause of action." *Le Parc Cmty. Ass'n v. Workers' Comp. Appeals Bd.*, 110 Cal. App. 4th 1161, 1170 (Cal. Ct. App. 2003) (internal quotation marks and bracketing omitted).

D.     California Law—Statute of Limitations

Pursuant to California law, wrongful death actions are subject to a two-year statute of limitations. *See* Cal. Civ. Proc. Code § 335.1.

California law provides that the statute of limitations "normally begins to run when the claim accrues, that is, when the cause of action is complete with all of its elements." *Soliman v. Phillip Morris Inc.*, 311 F.3d 966, 971 (9th Cir. 2002) (applying California law) (internal quotation marks omitted). "An exception to the general rule for defining the accrual of a cause of action—indeed, the most important one—is the discovery rule. . . . It postpones the accrual of

15

a cause of action until the plaintiff discovers, or has reason to discover, the cause of action."
*Norgart v. Upjohn Co.*, 981 P.2d 79, 88 (Cal. 1999) (Mosk, J.).

## IV.     Application of Law to Facts

In the Los Angeles County action, plaintiff Dyan Moore asserted an identical claim
against Lilly to the one pressed here. That claim was voluntarily dismissed with prejudice in
February 2011. *See* Request for Judicial Notice 29, Moore v. Eli Lilly & Co., No. 11-CV-5552
(E.D.N.Y. Nov. 8, 2011), CM/ECF No. 12. Pursuant to California law, the voluntary dismissal
with prejudice of her wrongful death claim bars her relitigation of that cause of action.

Plaintiff Larry Moore submitted a claim for damages to Lilly in January 2006,
demonstrating that he believed that Zyprexa had played a role in causing Ms. Marshall's death.
*See id.* at 40. Assuming that application of the discovery rule is appropriate, he had two years
from that date, at the latest, to bring an action against Lilly. The Orange County action, in which
he was named as a plaintiff, was not brought until late November 2010. *See* Notice of Removal
with Attachments 12, Moore v. Eli Lilly & Co., No. 11-CV-5552 (E.D.N.Y. Nov. 1, 2011),
CM/ECF No. 1. His claim is thus barred by the statute of limitations. There is no basis for
application of the doctrine of equitable tolling; no substantial reason has been proffered to justify
plaintiff's delay in bringing his claim against Lilly. *See, e.g.*, *Daviton v. Columbia/HCA
Healthcare Corp.*, 241 F.3d 1131, 1136-39 (9th Cir. 2001) (describing California's equitable
tolling doctrine).

## V.     Conclusion

Dyan Moore's action is barred by res judicata. The statute of limitations bars Larry
Moore's action. The arguments made by plaintiffs at a hearing conducted on April 19, 2012 and

16

in a letter of that same day do not require the court to conclude differently.  As noted in Part II.C,

*supra*, the claims of the other plaintiffs originally named in this action have previously been

dismissed without prejudice.  The case is dismissed as against all defendants.  No costs or

disbursements.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Date:    April 19, 2012
         Brooklyn, New York

17